## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH THE
GOOGLE ACCOUNT
KENANLAY619@GMAIL.COM THAT IS
STORED AT PREMISES CONTROLLED BY
GOOGLE LLC

CASE NO.  2:23-mj-607

**FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Tyler Schwab, being first duly sworn, hereby depose and state as follows:

### I.  INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for all

information associated with Gmail account kenanlay619@gmail.com, that is stored at premises

controlled by Google LLC ("Google"), an electronic communications provider headquartered at

1600 Amphitheatre Parkway, Mountain View, California.  The information to be searched is

described in the following paragraphs and in Attachment A.  This affidavit is made in support of

an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose

to the government the information further described in Section I of Attachment B.  Upon receipt

of the information described in Section I of Attachment B, government-authorized persons will

review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been

since January 6, 2019.  I have been assigned to the FBI Safe Streets Task Force in Columbus,

Ohio, since January of 2023.  Prior to being assigned to the Safe Streets Task Force, I was assigned

to the Joint Terrorism Task Force (JTTF) for approximately four years. During my assignment at

the JTTF, I was a Case Agent and Co-Case Agent for multiple international and domestic terrorism

investigations.  While assigned to the JTTF, I received specialized training in international terrorism and homicide investigations.  Furthermore, I have received training in computer-related crimes as well as in the criminal use of email, social media, and telephonic communications.  As a Special Agent with the FBI, I am empowered to enforce the criminal laws of the United States.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## II.  BACKROUND ON RECENT POSTAL ROBBERIES AND MAIL THEFT

4.      Federal law prohibits people from assaulting United States Postal Service (USPS) letter carriers with the intent to rob them of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier.  18 U.S.C. § 2114(a).  The same statute prohibits people from robbing or attempting to rob those letter carriers of mail matter, money, or other property that belongs to the United States and that was then in the lawful charge, control, or custody of the letter carrier.  *Id.*

5.      When someone commits such an assault or robbery and puts in jeopardy the life of the individual having custody of such mail, money, or other property of the United States by the use of a dangerous weapon, that person commits an "aggravated" assault or robbery under 18 U.S.C. § 2114(a), which qualifies as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A).

*Knight v. United States*, 936 F.3d 495, 501 (6th Cir. 2019). As such, when someone uses or carries a firearm during and in relation to an aggravated assault or robbery under § 2114(a), they have also violated 18 U.S.C. § 924(c)(1)(A). *Knight*, 936 F.3d at 497, 501.

6.     Federal law also prohibits people from stealing any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter. 18 U.S.C. § 1704.

7.     Finally, federal law prohibits people from stealing or attempting to steal any mail matter from or out of any mail receptacle or from any letter carrier. 18 U.S.C. § 1708. The same statute prohibits people from buying, receiving, concealing, or unlawfully possessing any mail matter that has been so stolen if the person has knowledge that the item was so stolen. *Id.*

8.     The United States, including the United States Postal Inspection Service (USPIS) and the FBI, has been conducting a criminal investigation into violations of 18 U.S.C. §§ 2114(a), 924(c), 1704, and 1708 committed in and around Central Ohio. The current investigation involves a pattern of violent, armed robberies wherein the suspect(s) hold USPS letter carriers at gunpoint and then force them to hand over their USPS "arrow keys" or "modified arrow keys." USPS letter carriers carry arrow keys and modified arrow keys when they deliver the mail. These keys allow letter carriers to gain entry to secured mail receptacles ("blue boxes") and secured cluster mailboxes found at apartment and condominium complexes. As of the writing of this affidavit, approximately thirty robberies have occurred from January 5, 2022, to September 25, 2023, throughout the Columbus, Ohio area that have been identified as part of this pattern.

9.     Once the suspect(s) obtain the stolen keys, those suspect(s) then use those keys to open secure mail receptacles and cluster boxes to steal mail matter. This process of stealing the mail is sometimes referred to as "fishing." The stolen mail matter includes, among other valuable items, personal checks, business checks, and other negotiable financial instruments.

The suspect(s) then wash these checks and/or reproduce them through fraudulent means before subsequently cashing and/or depositing them at ATMs and other locations. This process of washing and/or reproducing the checks is sometimes referred to as "cooking."

10.     Because a stolen USPS key can be utilized to "fish," "cook," and subsequently profit from, the stolen keys retain intrinsic value in and of themselves. I have learned that suspect(s) who rob letter carriers of their keys will sometimes sell those keys to third parties or "rent" them out to third parties for a discrete period without ever fishing or cooking themselves.

11.     I know, based on my knowledge, training, and experience, that individuals who are involved in the criminal activity described above often use cell phones to coordinate the initial assaults and/or robberies of the letter carriers and to facilitate the fishing, cooking, and financial crimes previously described.

12.     More specifically, I know that individuals involved in the criminal activity described above use cell phones to coordinate meetups with co-conspirators and others involved in the planning and execution of the initial postal assaults and/or postal robberies—including to procure firearms for use during those assaults and/or robberies. Those individuals also use cell phones for navigation purposes both to and from the site of an assault and/or robbery. Likewise, those individuals use cell phones to take photographs and videos of themselves in possession of stolen USPS keys and/or stolen mail matter. Those same individuals also use cell phones to coordinate the sale and/or rental of USPS keys to third parties. Finally, those individuals use cell phones to coordinate the fishing, cooking, and negotiation of stolen or fraudulent financial instruments. This use of cell phones involves calls, texts, social media applications, navigation tools, and a host of other available applications.

4

13.     I know based on my knowledge, training, and experience that when these individuals use their cell phones to make calls, send texts, use social media applications, and access navigation tools, many of these applications are run through Google products.

14.     I also know from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

## III. PROBABLE CAUSE

15.     I submit there is probable cause to believe that violations of 18 U.S.C. § 2114(a) [Aggravated Assault/Robbery of Postal Employees] and 18 U.S.C. § 924(c) [use or carrying of a firearm during and in relation to a crime of violence] (collectively, the "**TARGET OFFENSES**") have been committed by Kenan M. Lay (LAY), also known as "SWERV," and other individuals both known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

### A.  Attempted Armed Robbery – October 20, 2022

16.     On October 20, 2022, at approximately 5:17 p.m., Inspectors with the USPIS responded to 1612 Lockbourne Road, Columbus, Ohio, in reference to an attempted armed robbery of a postal worker.

17.     Upon arrival, Investigators spoke with a postal worker victim, "J.P.," a person over eighteen years old, who advised the following:

18.     While J.P. was outside of the German Village Postal Worker Annex, two suspects approached him.  One of the suspects motioned that he had a firearm and demanded that J.P. hand over his postal keys.  J.P. refused to give the suspects his postal keys and shoved one of the

5

suspects. Both suspects then fled the scene on foot. The suspects were unsuccessful at getting J.P.'s postal keys during this robbery.

19. On August 18, 2023, and September 8, 2023, Postal Inspectors and other law-enforcement agents, including your affiant, met with a cooperating informant who was involved in, participated in, helped plan, and had knowledge of multiple armed postal robberies and attempted postal robberies committed in the Columbus, Ohio area and elsewhere. That informant ("CI #1") admitted to his own role in roughly a dozen postal robberies – either as a planner, facilitator, or participant – and shared information regarding the spate of other recent postal robberies, mail theft, and related financial crimes described throughout this affidavit. CI #1 is currently facing federal charges for his role in several of these robberies. CI #1 met with investigators in the hope of receiving more favorable consideration in his current case, but no promises were made to him regarding the nature or extent of any charging and/or sentencing leniency. To date, the information that CI #1 provided has proved truthful and reliable through corroboration from other human sources, law-enforcement reports, cell-site location data and GPS location data, and other electronic evidence obtained during this investigation.

20. CI #1, who was involved in, participated in, helped plan, and had knowledge of four postal robberies and/or attempted robberies that LAY was involved in, provided the following information regarding Attempted Armed Robbery #1:

21. LAY was involved in this attempted robbery with two other individuals—one driver and one other individual who approached the postal worker on foot with LAY. Following the attempted robbery, they told CI #1 that they tried to rob the postal worker, but the postal worker would not give up his keys. They ended up in a scuffle with the postal worker. CI #1 knew that this robbery was supposed to take place somewhere off Parsons Avenue, but the postal worker did

6

not show up at the time they thought they would. As a result, LAY and the two other individuals ended up following a different postal worker back to a Post Office where they attempted to rob him. According to CI #1, LAY was carrying a firearm during this attempted robbery, but CI #1 did not think that LAY pulled the gun out. LAY and the two other individuals were unsuccessful in obtaining the postal keys during this attempted robbery.

### B. Armed Robbery – January 17, 2023

22.     On January 17, 2023, at roughly 3:10 p.m., Inspectors with the USPIS responded to 400 South 5th Avenue, Columbus, Ohio, in reference to a robbery of a postal worker.

23.     Upon arrival, Investigators spoke with a postal worker victim "D.S.," a person over eighteen years old, who advised the following:

24.     While delivering mail on a central collections mail route in the area of 400 South 5th Avenue, a suspect approached D.S. on foot and attempted to grab his postal keys from him. The suspect was brandishing a handgun. The suspect then took D.S.'s postal keys and fled the area in a vehicle. The postal keys that were stolen included a modified arrow key. D.S. described the driver of the vehicle as a black male, wearing a gray hoodie and black face mask.

25.     According to CI #1, CI #1, LAY, and two other individuals were involved in this robbery. Prior to the robbery, CI #1 drove LAY and one other individual to the Brookville neighborhood to pick up a stolen vehicle they were going to use for the robbery. The stolen vehicle they used during this robbery was a silver KIA sedan. The stolen Kia would not initially start, so they had to call yet another individual who came and jump-started the car. Once the stolen Kia was started, LAY and the other individual drove it, while CI #1 followed them in his vehicle to a McDonald's. When they got to the McDonald's, a fourth individual met up with them and provided the location of where the postal worker would be located. CI #1 then left this meeting

and spotted a postal worker. CI #1 then called the fourth individual, who called LAY and told him where the postal worker was located.

26.     When LAY and one of the other individuals got to where the postal worker was located, LAY parked the stolen KIA sedan and the other individual got out of the vehicle. The other individual approached the postal worker and tried to pull the postal worker's key, which was still in the mailbox, out of the mailbox. When the key did not come out of the mailbox, the other individual lifted his shirt and showed the postal worker his gun. The other individual then shut the mailbox and pulled the postal key out of the mailbox. While the robbery was taking place, CI #1 was in the area watching it happen.

27.     Following the robbery, LAY and the other individual ditched the stolen KIA sedan in the area of 24th Street and Joyce Avenue, where CI #1 picked them up. CI #1 then took the other individual home in the Reynoldsburg area. CI #1 and LAY then went to a Walmart located on South High Street where they met the fourth individual. CI #1 and the fourth individual ended up paying LAY for the postal keys. CI #1 then drove LAY back to his residence, which was located in the Driving Park area.

28.     Additionally, during a review of the contents of CI #1's phone, investigators found a text conversation between CI #1 and LAY. During this conversation, LAY was using phone number (614) 596-2479 and identified himself as "SWERV" on October 5, 2022. Later, in this same text chain, on January 17, 2023, LAY and CI #1 exchanged the following messages:

Lay:    are we on!

CI #1:  Yop

CI #1:  Send lo

Lay:    when we ready

Lay:     so I can suit up

Lay:     1692 E Kossuth St

CI #1:  Im fin leave at 11

Lay:     you getting me?

CI #1:  Ye

29.     Further on in that same text conversation from January 17, 2023:

CI #1:  Yu gotta blicc?

Lay:     fasho

30.     Through my knowledge, training, and experience in this investigation and others, I know that when CI #1 wrote, "Yu gotta blicc?" he was asking LAY if LAY had a firearm. The term blicc is slang for gun. Also, when CI #1 wrote "Send lo," he was requesting that LAY send him his location, which LAY did by providing his address as 1692 East Kossuth Street, which is in the Driving Park neighborhood. Additionally, when LAY wrote, "so I can suit up," LAY was referring to getting the things together he will need for the robbery, such as his gray hoodie and black face mask.

31.     Additionally, at the time of this robbery, CI #1 was under court-ordered electronic monitoring while out on bond in an unrelated criminal case. As a result, CI #1 was wearing an ankle monitor that recorded his locations. CI #1's ankle monitor corroborates what he told investigators as his ankle monitor recorded CI #1's locations on January 17, 2023, at the following times:

- CI #1 was at 1692 East Kossuth Avenue (LAY'S residence), at approximately 12:07 p.m. (picking up Lay prior to the robbery).

- CI #1 was in the Brookville neighborhood from approximately 1:26 p.m. to 2:11 p.m. (CI #1 dropping off LAY and the other individual at the stolen Kia sedan prior to the robbery and trying to get the vehicle jump started).

- CI # 1 was at the McDonald's located at 381 East Main Street from approximately 3:04 p.m. to 3:08 p.m. (meeting location with the fourth individual).

- CI #1 was in the area of 400 South 5th Avenue (robbery location site) at approximately 3:11 p.m. (contemporaneous with the robbery).

- CI #1 was at the Walmart located at 3579 South High Street from approximately 5:54 p.m. to 6:33 p.m. (meeting location where CI #1 and the fourth individual paid LAY for the postal keys).

- CI #1 was at 1692 East Kossuth Avenue (LAY'S residence) at approximately 6:57 p.m. (dropping Lay off after the robbery).

### C. Armed Robbery – April 24, 2023

32.     On April 24, 2023, at roughly 11:30 a.m., Inspectors with the USPIS responded to Parkway Village Drive, Grove City, Ohio, in reference to a robbery of a postal worker.

33.     Upon arrival, Inspectors spoke with postal worker victim "K.H.," a person over eighteen years old, who advised the following:

34.     While delivering mail at the community mailboxes within the Parkway Village Apartment complex, K.H. was approached from behind.  A gun was brandished and K.H. was directed to give the suspect the keys.  K.H. complied and the suspect got away with his postal keys, gas card, and a backpack of personal belongings.

35.     CI #1 was also involved in orchestrating this robbery.  According to CI #1, prior to the robbery taking place, CI #1 drove CI #2, Thierno Bah, and LAY to a Menards' parking lot

where they met up with other people. Once at the Menards' parking lot, LAY got out of CI #1's vehicle and got into another vehicle with Thierno Bah and one other individual. Thierno Bah has since been arrested and indicted for his role in multiple postal robberies. LAY, Thierno Bah, and the other individual then left the Menards' parking lot to do the robbery.

36.     After the robbery took place, everyone met at a McDonald's, but they moved down the street to a neighborhood to complete the transaction. CI #1 and another individual split the payment for this key. CI #1 gave LAY/Thierno Bah $500 and the other person gave LAY/Thierno Bah $1,000 for the postal key.

37.     CI #1 knew that Thierno Bah used LAY'S gun to commit the robbery. LAY had a Taurus handgun, which CI #1 saw LAY with prior to the robbery taking place. CI #1 knew that Thierno Bah used this gun during the robbery because after the robbery took place, Theirno Bah told CI #1 that LAY let him use it.

38.     CI #2, who has knowledge of and was present for the meetings prior to and following a number of postal robberies, told investigators that prior to this robbery taking place, CI #2, CI #1, and Thierno Bah met other individuals at a McDonalds on Lockbourne Road. Once at McDonald's, Thierno Bah and SWERV left with other individuals to do the robbery. After the robbery was completed, they all met back up at the McDonald's again but went down the street to a neighborhood to complete the transaction. CI #2 saw LAY and Thierno Bah get approximately $1,500 in cash for the postal key.

39.     CI #1 was again wearing his ankle monitor during this robbery. The GPS data from the ankle monitor shows that CI #1 was at the following locations on April 24, 2023:

- CI #1 was in the Menards' parking lot located at 831 Hilliard Rome Road from approximately 10:03 a.m. to 10:12 a.m.

11

- CI #1 was at McDonald's located at 4601 West Broad Street from approximately 10:28 a.m. to 10:38 a.m.

- CI #1 was at McDonald's located at 2441 Lockbourne Road from approximately 12:07 p.m. to 12:29 p.m.

- CI #1 was then in a neighborhood located on Edsel Avenue which is Southeast of the McDonald's located at 2441 Lockbourne Road from 12:34 p.m. to 12:46 p.m.

40.     Based on my knowledge, training, and experience, criminal informants do not always get the locations correct when they are recounting events months after they occurred. So, when CI #2 told investigators that prior to and after the robbery they met at a McDonald's on Lockbourne Road, CI #2 was not one hundred percent correct. They did meet at a McDonald's prior to the robbery, but this McDonald's was located at 4601 West Broad Street. However, after the robbery, they did meet at a McDonald's located at 2441 Lockbourne Road. Due to the amount of time that passed from when the robbery took place until the time CI #2 told investigators about the robbery, approximately two months, it is understandable that CI #2 did not get the location of the first McDonald's correct.

### D.  Armed Robbery – May 11, 2023

41.     On May 11, 2023, at roughly 9:26 a.m., Inspectors with the USPIS responded to the Post Office located at 2873 West Broad Street in reference to a robbery of a postal worker.

42.     Upon arrival, Inspectors spoke with postal worker victim "B.F.," a person over eighteen years old, who advised the following:

43.     While outside the Post Office, a suspect approached B.F. and told her to give him the keys. When B.F. asked the suspect what keys he was referring to, the suspect hit B.F. on the side of her head with a gun. The suspect then demanded the keys again. B.F. was then followed

12

by the suspect into the Post Office. Once inside the Post Office, B.F. got the arrow keys from the retail window and threw them at the suspect. The suspect then departed the Post Office on foot. During this robbery, the suspect was able to obtain arrow key #98-27596 and the new modified arrow key #D899-20024.

44. The firearm was described as a black semi-automatic handgun. The slide was lighter than the frame and the barrel was lighter than the slide.

45. According to CI #1, on the morning of the robbery, prior to the robbery taking place, CI #1 drove CI #2, Thierno Bah, and one other individual to LAY'S house. When they got to LAY'S house, LAY gave them his gun. The gun LAY gave to CI #1 was a Taurus and was the same gun that LAY had previously used in one of the other postal robberies.

46. CI #1's ankle monitor also shows that he was in the area of 1692 East Kossuth Street, LAY'S residence, on the morning of May 11, 2023, at approximately 6:39 a.m.

47. Text conversations between CI #1 and LAY's email address, kenanlay619@gmail.com, from CI #1's phone were also found from May 11, 2023. At approximately 1:33 a.m. on May 11, 2023, CI #1 and LAY had the following discussion:

CI #1: Tryn let me use yo blicc tmr

CI #1: I'll throw $100 Juss need for hr

kenanlay619@gmail.com:     bet

kenanlay619@gmail.com:     Only for hr?

48. Based on my knowledge, training, and experience, I know that "bet" is slang for ok or alright. So, when CI #1 asked LAY if he could use his gun tomorrow, LAY responded with "bet," or ok.

49.     Further on in the same conversation, at approximately 6:02 a.m., the following text exchange occurred:

kenanlay619@gmail.com:     when you coming

CI #1: Fin leave rn be dere in 30

kenanlay619@gmail.com:     1692 e kossuth

50.     CI #1's CashApp records from May 11, 2023, also show that CI #1 paid $100 to Kenan Lay at approximately 6:39 a.m., corroborating CI #1's payment to LAY for use of his firearm during this robbery.

### E.  Arrest of Kenan Lay – October 12, 2023

51.     On October 11, 2023, LAY was indicted by a Federal Grand Jury for one count of 18 U.S.C. 2114(a) and 2(a), robbery of mail, money, or other property of the United States, and one count of 18 U.S.C. 924(c)(1)(A)(i) and 2(a), use of a firearm during and in relation to a crime of violence.  On October 12, 2023, LAY was arrested by the FBI.  During a recorded interview of LAY, that took place on October 12, 2023, following his arrest, LAY acknowledged that email address kenanlay619@gmail.com was his.  LAY also explained during the interview that at certain points LAY did not have a working cell phone number.  However, when LAY did not have a working cell phone number, he was still able to text with people.  LAY was able to do this because LAY'S iMessages were linked to his email address, kenanlay619@gmail.com.  During the periods where LAY did not have a working cell phone number, when he would text with other people it still would go through but would show the text coming through his kenanlay619@gmail.com email address.  The text messages from CI #1's phone show that CI #1communicated through text with LAY that went through LAY'S email address, kenanlay619@gmail.com, from approximately March 28, 2023, to May 11, 2023.

52.     Additionally, prior to the FBI arresting LAY, LAY was also arrested on August 26, 2023, by the Grove City Police Department (GCPD) and initially charged with Improper Handling of a Firearm and Trafficking in Drugs in Franklin County Municipal Court Case No. 2023-CRA-013944.   On September 11, 2023, prosecutors dismissed those charges for future indictment. When LAY was arrested by GCPD, GCPD found in LAY'S possession a loaded Taurus GC2 handgun (S/N: TMC11502), nineteen bags of marijuana, two scales with marijuana residue, a box of plastic baggies, a wallet with LAY'S information inside, and an Apple iPhone 11 with IMEI #356561109941329 and an Apple iPhone XR with IMEI #353061106207629.

## IV.  BACKGROUND CONCERNING GOOGLE

53.     Google is considered an electronic communications service ("ECS") and a remote computing service ("RCS") provider because it provides its users access to a variety of electronic communications and remote computing services as defined by 18 U.S.C. §§ 2510(15) and 2711(2). Google provides a diverse array of Internet-based services designed to facilitate communication, information sharing, and cloud storage for its users.   User-based services range from email (Gmail), to online collaborations platforms (such as Google Docs, Google Sheets, Google Forms, and Google Jamboard), to cloud storage (Google Drive).  Google requests that when users create a Google account, they provide basic information, such as name, zip code, and other personal/biographical information.  However, Google does not verify the information provided for its free services.

54.     Additionally, Google provides the Apple mobile operating system used on mobile electronic devices, such as smartphones and tablets. Mobile devices running on the Apple operating system frequently come with a suite of Google applications-such as Gmail, Chrome, Google Maps, and Google Play-preinstalled on the device and accessible using a Google account.

When a user purchases and activates a mobile device running the Apple operating system, one of the initial prompts during the set-up phase is to associate a Gmail account with the device. If the consumer does not have an existing Gmail account, the operating system prompts the user to create a new account. Whether the Gmail account is new or existing, the association of the account with the device allows Google to collect and store information regarding the use of the device which can be relevant to the criminal investigation.

55.    Google maintains electronic records pertaining to each Google account. These records include account access information, email transaction information, account application information, and device registration information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

56.    Google stores information about mobile devices associated with the user's Google account. This includes the make, model, and unique serial numbers of all linked devices. Based on my training and experience, I know this information can help identify previously unknown mobile devices associated with the suspect's account.

57.    Users of Google services may access their accounts on servers maintained or owned by Google from any computer or mobile device connected to the Internet located anywhere in the world.

58.    Google also offers users access to a free voice-over-internet-protocol (VOIP) communications system called Google Voice. Users are provided with a phone number they select from a pool of available numbers. These numbers can be from whatever area code and prefix they desire and have no correlation with the user's actual location when the number is selected. Users can make and receive phone calls and text messages through the Google Voice platform on their

16

device or through a browser. Google maintains call detail records similar to those of a traditional cellular or wire line telephone company. Additionally, they also store the text message content of sent and received text messages, as well as any saved voice mails and the associated transcript.

59. Google collects and retains location data from Apple-enabled mobile devices that have opted into the Location Services and Location History services. The company uses this information for location-based services, such as targeted advertising and Google Maps guidance. This information derives from a range of sources, including Global Positioning System (GPS) data, cell site/cell tower information, and Wi-Fi access points. User preferences may impact the extent and detail of the location information collected. Other information may be collected by Google that provides inferences about a user's location. For example, WiFi access points may have descriptive names or be associated with locations in publicly accessible geolocation databases. IP addresses may also be associated with locations through similar services. Advertising records may contain specific or inferred location information. Metadata associated with image and video files stored by Google on behalf of a user may include information about where the images or videos were taken (EXIF data, for example). In my training and experience, this data can show the movement of the suspect's mobile device and assist investigators with establishing patterns of movement and identifying their participation in robberies of postal workers.

60. When a user links their Apple device to their Google account, they have the option to transfer all the names, addresses, phone numbers, email addresses, notes, and pictures associated with the account to the phone and vice-versa. When connected to the internet, Google Services will then sync any future changes across devices associated with the account which have opted in to this service. This information can assist with identifying previously unknown co-conspirators or witnesses.

# V. CONCLUSION

61.     Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on Google's servers associated with Gmail account kenanlay619@gmail.com will contain evidence of violations of 18 U.S.C. § 2114 (robbery of mail, money, or other property of the United States) and 18 U.S.C. § 924(c) (use or carrying of a firearm during and in relation to a crime of violence).

62.     In particular, I believe the information associated with Gmail account kenanlay619@gmail.com will include Evidence indicating how, when, and where the Google mobile applications associated with LAY'S phone were accessed or used, to include the geographical location of the device used when the applications were accessed.

63.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Tyler Schwab
Special Agent
FBI

Subscribed and sworn to before me on_____ November 2 ____, 2023

Elizabeth A. Preston Deavers
United States Magistrate Judge

18

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Gmail account: kenanlay619@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Items to Be Seized

**I.      Information to be disclosed by Google**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, including any records, files, logs, or information that has been deleted but is still available to Google, Google is required to disclose the following information to the government for Gmail account: kenanlay619@gmail.com.

a.  All records or other information regarding the identification of the user(s) of applications associated with the Gmail account: kenanlay619@gmail.com, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b.  All location information relating to the Gmail account: kenanlay619@gmail.com, whether derived from Global Positioning System (GPS) data or Wi-Fi location. Such data shall include the GPS coordinates, the dates and times of all location recordings, and origin of how the location recordings were obtained and estimated radius, for the period October 19, 2022, to May 12, 2023.

c.  The provider is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

## II.     Information to Be Seized

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2114 (robbery of mail, money, or other property of the United States) and 18 U.S.C § 924(c) (use or carrying of a firearm during and in relation to a crime of violence) that have been committed between October 19, 2022, and May 12, 2023, involving Kenan LAY.